Representative Mike SYNAR, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant,

United States Senate, Speaker and Bipartisan Leadership Group of the United States House of Representatives, Comptroller General of the United States, Intervenors.

NATIONAL TREASURY EMPLOYEES UNION, Plaintiff,

v.

UNITED STATES of America, Defendant,

United States Senate, Speaker and Bipartisan Leadership Group of the United States House of Representatives, Comptroller General of the United States, Intervenors.

Civ. A. Nos. 85–3945, 85–4106.

United States District Court, District of Columbia.

Feb. 7, 1986.

Alan B. Morrison, with whom Katherine A. Meyer was on brief, for plaintiffs in No. 85–3945.

Lois G. Williams, with whom Gregory O'Duden and Richard S. Edelman were on brief, for plaintiff in No. 85–4106.

Richard K. Willard, Asst. Atty. Gen., with whom Joseph E. diGenova, U.S. Atty., David J. Anderson, Branch Director, Neil H. Koslowe, Sp. Litigation Counsel, and Douglas Letter, Harold J. Krent, Robert E. Kopp, Leonard Schaitman, Judith Ledbetter, Lee Sarah Liberman, Lori Fields and Richard Greenberg, Attys., U.S. Dept. of Justice, were on brief, for defendant U.S.

Michael Davidson, Counsel, with whom Ken U. Benjamin, Deputy Counsel, and

Morgan J. Frankel and John C. Grabow, Asst. Counsel, U.S. Senate, were on brief, for intervenor-defendant U.S. Senate.

Steven R. Ross, Gen. Counsel, with whom Charles Tiefer, Deputy Gen. Counsel, and Michael L. Murray, Asst. Counsel to the Clerk of U.S. House of Representatives, were on brief, for intervenor-defendant Speaker and Bipartisan Leadership Group of U.S. House of Representatives.

Lloyd N. Cutler, with whom Harry R. Van Cleve, Gen. Counsel, James F. Hinchman, Deputy Gen. Counsel, Robert P. Murphy, Attorney-Advisor, U.S. Gen. Accounting Office, John H. Pickering, William T. Lake, Michael S. Helfer, Daniel M. Drory and Richard K. Lahne were on brief, for intervenor-defendant Comptroller General of U.S.

Before SCALIA, Circuit Judge, JOHNSON, District Judge and GASCH, Senior District Judge.

PER CURIAM:

Plaintiffs in these consolidated cases challenge the constitutionality of certain features of the Balanced Budget and Emergency Deficit Control Act of 1985, Pub.L. No. 99–177, 99 Stat. 1037, popularly known as the Gramm-Rudman-Hollings Act, signed into law by President Reagan on December 12, 1985. The principal issues presented are whether the plaintiffs, Members of Congress and the National Treasury Employees Union, have standing to litigate the points they raise; whether the Act unconstitutionally delegates legislative powers that may be exercised only by Congress; and, if not, whether it confers upon the Comptroller General executive powers that may not constitutionally be given to an officer removable by Congress. We find that plaintiffs in both cases have standing, and that the powers in question may lawfully be delegated, but that the delegation to the Comptroller General violates the constitutionally requisite separation of powers.

I

In the Act, Congress has set a "maximum deficit amount" for each of the fiscal years 1986 through 1991, its size progressively reducing to zero in fiscal year 1991. Section 251 provides that each year the Directors of the Office of Management and Budget ("OMB") and the Congressional Budget Office ("CBO") shall estimate the amount of the deficit for the upcoming fiscal year, and, if it exceeds the maximum deficit amount for that fiscal year by more than a specified amount, shall calculate, program by program pursuant to rules specified in the Act, the budget reductions necessary to ensure that the deficit does not exceed the maximum deficit amount for that year. The Directors must jointly report their deficit estimates and budget reduction calculations to the Comptroller General. After reviewing the Directors' report, the Comptroller General must issue his own report, containing his deficit estimates and budget reduction calculations, to the President and Congress. Section 252 of the Act requires the President to issue a "sequestration" order containing the budget reductions specified by the Comptroller General. After a prescribed time, the sequestration order becomes effective and the spending reductions included in that order are automatically made. The automatic deficit reduction process for fiscal year 1986 has progressed to the point of issuance, on February 1, 1986, of the presidential sequestration order, which will take effect on March 1, 1986. *See Order, Emergency Deficit Control Measures for Fiscal Year 1986* (Feb. 1, 1986).

The Act also provides what might be called a "fallback" deficit reduction process, to take effect if any of the reporting procedures of the above-described "automatic" deficit reduction process are found unconstitutional. Under the fallback process, the report prepared by the Directors of the OMB and the CBO is submitted, instead of to the Comptroller General, to a special joint committee of Congress, which must in five days report to both Houses a joint resolution setting forth the contents of the Directors' report. The joint resolu-

tion is then considered under special rules, and, if passed and signed by the President, serves as the basis for the presidential sequestration order under section 252.

Civil Action No. 85–3945, seeking declaratory relief against the United States, was commenced on December 12, 1985 by Mike Synar, a Member of the House of Representatives who voted against the Act. An amended complaint, filed on December 19, 1985, added as plaintiffs eleven other Representatives who voted against the Act. Jurisdiction is averred to exist pursuant to subsection 274(a)(1) of the Act, which authorizes any Member of Congress to bring an action in this court "for declaratory and injunctive relief on the ground that any [presidential] order that might be issued pursuant to section 252 violates the Constitution."[1]

The complaint alleges that the automatic deficit reduction process, under which the President is required by section 252 to issue a sequestration order implementing the report issued by the Comptroller General pursuant to section 251, is unconstitutional in two respects. Plaintiffs' first contention, briefly and essentially, is that the delegation of power by Congress to the President and other government officials is an unconstitutional delegation of legislative power. Their second contention is that the powers assigned to the Comptroller General and the Director of the CBO, both deemed legislative branch officials by plaintiffs, constitutionally must be assigned to executive branch officials. The Representatives allege that these unconstitutional provisions injure them by (1) interfering with their constitutional duties to enact laws regarding federal spending; (2) causing automatic reductions in their salaries, staff salaries, and office expenses; and (3) causing automatic reductions in a variety of programs benefiting their constituents. They seek a judgment declaring that the automatic deficit reduction process is unconstitutional and that the President is without power, therefore, to order spending reductions pursuant to that process.

In response to the *Synar* complaint, the United States filed a motion to dismiss on the ground that the congressional plaintiffs lack standing to bring the action. The United States Senate and the Comptroller General moved for leave to intervene as defendants and also filed motions to dismiss on the ground that the Act is constitutional. The unopposed motions to intervene were granted on December 31, 1985.

Civil Action No. 85–4106, challenging the constitutionality of the automatic deficit reduction process on legal theories identical to those presented in the *Synar* action, was filed on December 31, 1985 by the National Treasury Employees Union ("NTEU"). NTEU, an unincorporated association representing the interests of both active and retired federal employees, alleges that its retired members have been injured as a result of the Act's automatic spending reduction provisions, which have operated to suspend cost-of-living adjustments ("COLAs") otherwise due federal retirees on January 1, 1986, and which will operate to cancel those COLAs and other COLAs due in the future. NTEU invokes the court's jurisdiction pursuant to 28 U.S.C. § 1331 and to subsection 274(a)(2) of the Act, which provides, in pertinent part, that "any other person adversely affected by an action taken under this title, may bring an action [in this court] for declaratory judgment and injunctive relief concerning the constitutionality of this title." By Order dated January 2, 1986, the NTEU suit was consolidated with the earlier action.

Subsequent to consolidation, the congressional plaintiffs and NTEU filed their respective motions for summary judgment on January 6, 1986. The congressional plaintiffs also filed an opposition to the motion of the United States to dismiss their complaint for lack of standing. Thereafter, on

---

**1.** Subsection 274(a)(5) provides that any such action "shall be heard and determined by a three-judge court in accordance with [28 U.S.C. § 2284]." A designation of judges to serve as the three-judge district court in this case was made by the Chief Judge for the District of Columbia Circuit on December 16, 1985.

January 8, 1986, the Speaker and Bipartisan Leadership Group of the United States House of Representatives, granted leave to intervene as a defendant in the consolidated cases, filed a memorandum of law in support of the constitutionality of the Act.

The United States filed a cross-motion for summary judgment, again contending that the complaint of the congressional plaintiffs must be dismissed for lack of standing but conceding that NTEU appears to have standing. On the merits, the position of the United States is that the Act does not unconstitutionally delegate legislative authority but that the role of the Comptroller General in the automatic deficit reduction process violates the principle of separation of powers.[2]

The motions of plaintiffs for summary judgment, as well as the cross-motion of the United States for summary judgment on the merits, are opposed by the Senate, the Comptroller General, and the Speaker and Bipartisan Leadership Group of the United States House of Representatives. Argument on these dispositive motions was heard on January 10, 1986, and the cases taken under advisement. By Order dated January 23, 1986, the Senate and the Comptroller General were granted leave to intervene in the NTEU action.

## II

In view of the established rule that "consolidation ... does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another," *Johnson v. Manhattan Railway*, 289 U.S. 479, 496–97, 53 S.Ct. 721, 727–28, 77 L.Ed. 1331 (1933); *see also McKenzie v. United States*, 678 F.2d 571, 574 (5th Cir.1982), we find it necessary to make separate standing determinations with respect to the plaintiffs in each case under consideration. Moreover, even though the standing of NTEU has not

been directly challenged, we must satisfy ourselves that NTEU has standing before we can proceed to consider its claims. Article III circumscribes the power of federal courts, and "[t]hose who do not possess Art. III standing may not litigate as suitors in the courts of the United States." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475–76, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982). Before turning to a particularized analysis of whether NTEU and the congressional plaintiffs have made the necessary showing for standing in their respective cases, a brief general discussion of the applicable principles is appropriate.

While the plaintiffs invoke this court's jurisdiction under the judicial review provisions contained in section 274 of the Act, they concede, as they must, that Congress may not abrogate the constitutional limitations imposed by Article III upon the power of the federal courts. *See Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Muskrat v. United States*, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed.2d 246 (1911). Article III limits the jurisdiction of federal courts to "cases or controversies," and "whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III . . . is the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Principles of standing ensure that one who invokes the power of a federal court satisfies this "case or controversy" requirement.

Although the Supreme Court has noted that "the concept of 'Art. III standing' has not been defined with complete consistency in all of the various cases decided by this Court which have discussed it," *Valley Forge Christian College*, 454 U.S. at 475, 102 S.Ct. at 760, the Court has repeatedly recognized that the concept entails certain

---

**2.** The United States has also requested us to declare that the fallback deficit reduction process contained in § 274 of the Act is constitutional. Although we see no reason to doubt that proposition, the issue simply is not before this

court. The plaintiffs have conceded the constitutionality of the fallback process, and the United States—the nominal *defendant*—has not set forth any claim for relief in its own behalf.

basic requirements. The first and most fundamental of these is that a party must allege a "distinct and palpable injury to himself." *Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. at 2206. This injury must be a "particular concrete injury," *United States v. Richardson,* 418 U.S. 166, 177, 94 S.Ct. 2940, 2946, 41 L.Ed.2d 678 (1974), which must amount to "a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum,* 408 U.S. 1, 14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972). A plaintiff need not await the consummation of a threatened injury in order to have standing; it is sufficient that the injury is imminent. *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979). The further requirements of Article III standing are set forth in the Supreme Court's recent formulation that "at an irreducible minimum, Art. III requires the party who invokes the court's authority to [show] ... that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Valley Forge Christian College,* 454 U.S. at 472, 102 S.Ct. at 758 (quoting *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976)); *see also Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

■ Thus, at a minimum, Article III requires NTEU and the congressional plaintiffs to show (1) actual or threatened inju-ry, (2) traceable to the defendant, and (3) amenable to judicial remedy.[3] In analyzing whether they have done so, we must accept as true all material allegations of the complaints and construe them in favor of the complaining parties. *Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. at 2206. We therefore assume, for the limited purpose of the following standing analysis, that the automatic deficit reduction process challenged by plaintiffs is unconstitutional.

### A

■ NTEU contends that it has standing to bring this action because subsection 252(a)(6)(C)(i) of the Act, as part of the automatic deficit reduction process, has operated to suspend payment of annual COLA benefits otherwise due those of its members who are federal retirees. NTEU also complains that, effective March 1, 1986, the presidential sequestration order issued on February 1, 1986 will permanently cancel retirees' COLA benefits for this fiscal year.[4] It claims that these actual and threatened injuries have been and will be caused by the automatic deficit reduction process and would be redressed if that process were declared unconstitutional.

It is well established that an association such as NTEU has standing to sue solely as the representative of its members, provided that they individually would have standing. *Warth v. Seldin,* 422 U.S. at 511, 95 S.Ct. at 2211. There is no question that NTEU's federal retiree members have

---

**3.** In the ordinary case, other limitations on standing exist—so-called "prudential" limitations, not strictly required by Article III. One of these that might normally have some effect in the present case is the requirement that the plaintiff be arguably within the "zone of interests" intended to be protected by the statutory or constitutional provision on which he relies. *See, e.g., Valley Forge Christian College,* 454 U.S. at 475, 102 S.Ct. at 760. We disregard these prudential limitations because we think it clear that Congress has, by enacting the judicial review provisions contained in § 274, expanded standing to challenge the constitutionality of the Act to the full extent permitted by Article III. *Cf. Gladstone, Realtors v. Village of Bellwood,* 441 U.S. at 100, 99 S.Ct. at 1608.

**4.** Subsection 252(a)(6)(C)(i) provides, in pertinent part:

> Notwithstanding any other provision of law, any automatic spending increase that would (but for this clause) be ... paid [between the enactment of the Act and the effective date of a sequestration order for fiscal year 1986] shall be suspended until such order becomes effective, and the amounts that would otherwise be expended during such period with respect to such increases shall be withheld. If such order provides that automatic spending increases shall be reduced to zero during [fiscal year 1986], the increases suspended pursuant to the preceding sentence and any legal rights thereto shall be permanently cancelled.

suffered actual injury by the suspension of their COLA benefits pursuant to the Act, and that they will suffer further injury by the permanent cancellation of those benefits on March 1, 1986, under the terms of the President's February 1 sequestration order. *See Order, Emergency Deficit Control Measures for Fiscal Year 1986* 1, 4 (Feb. 1, 1986). We conclude that NTEU has made a sufficient showing of injury to satisfy Article III's threshold requirement of injury-in-fact.

■ We must also consider the question of redressability, *i.e.*, whether it is likely that the relief requested will redress the injury complained of, before a finding of standing can be made. As to at least the second of the injuries of which NTEU complains—the imminent permanent cancellation of its members' COLA benefits by the operation of the presidential sequestration order—it is unquestionable that a judicial remedy exists. If we declare the automatic deficit reduction process invalid, no cancellation of the COLA benefits will occur as a result of that process.[5] Rather, the fallback deficit reduction process established by subsection 274(f) will come into play,[6] and any cancellation of COLAs under that process will require the passage of legislation. The mere possibility that subsequent legislation might produce the same harm for which a judicial remedy is sought is not sufficient to eliminate redressability and hence standing. *Cf. Orr v. Orr*, 440 U.S. 268, 272, 99 S.Ct. 1102, 1108, 59 L.Ed.2d 306 (1979).

Because the threatened injury of permanent cancellation of the COLA benefits pursuant to an unconstitutional process may be redressed, we conclude that NTEU has standing to bring its action.

**B**

■ Of the three types of injury that the congressional plaintiffs rely upon for standing, briefly outlined above, we need consider only their claim that the automatic deficit reduction process interferes with their constitutional duties to enact laws regarding federal spending and infringes upon their lawmaking powers under the Constitution, in that spending reductions made pursuant to the challenged process will, in effect, override earlier, duly enacted appropriations laws in a manner other than that prescribed by Article I, section 7. In response, the United States contends that this injury is nothing more than a generalized grievance shared by all other citizens and thus insufficient to support standing.

Under the law of this Circuit, which recognizes a personal interest by Members of Congress in the exercise of their governmental powers, limited by an equitable discretion in the courts to withhold specific relief,[7] we conclude that standing exists. Although it is somewhat difficult to reconcile the various cases on congressional standing in this Circuit, and in particular to tell which denials of relief in earlier cases, seemingly for lack of standing, are now to be explained, in light of later cases, as resting upon an exercise of equitable discretion, the cases clearly recognize that specific injury to a legislator in his official capacity may constitute cognizable harm

5. Although the provision for COLA suspensions would survive invalidation of the portions of the Act under challenge here, it cannot be argued that indefinite suspension (*i.e.*, suspension unless and until a joint resolution is enacted) would render our invalidation of automatic cancellation illusory. It is clear from the language and structure of § 252(a)(6)(C)(i)-(ii) that any COLA suspension would extend no longer than one fiscal year.

6. In light of the existence of the fallback process and the fact that the remainder of the Act, as supplemented by that process, functions as a coherent piece of legislation, there is no doubt that the automatic deficit reduction process is severable from the remainder of the Act.

7. Two judges of the Court of Appeals, including a member of the present panel, have expressed disagreement with this analysis, *see Barnes v. Kline*, 759 F.2d 21, 41 (D.C.Cir.1985) (Bork, J., dissenting), *cert. granted,* — U.S. —, 106 S.Ct. 1258, 89 L.Ed.2d 569 (1985); *Moore v. United States House of Representatives*, 733 F.2d 946, 956 (D.C.Cir.1984) (Scalia, J., concurring), *cert. denied,* — U.S. —, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985). It has, however, been adopted by several panels of the Court of Appeals and is the law of this Circuit.

sufficient to confer standing upon him. *See, e.g., Moore v. United States House of Representatives,* 733 F.2d 946, 952 (D.C. Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985); *Vander Jagt v. O'Neill,* 699 F.2d 1166 (D.C.Cir. 1982), *cert. denied,* 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983); *Riegle v. Federal Open Market Committee,* 656 F.2d 873 (D.C.Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981). More specifically, our Court of Appeals has held that "unconstitutional deprivations of a legislator's constitutional duties or rights ... may give rise to standing if the injuries are specific and discernible." *Moore v. United States House of Representatives,* 733 F.2d at 952 (citing *Kennedy v. Sampson,* 511 F.2d 430 (D.C.Cir.1974); *Harrington v. Bush,* 553 F.2d 190 (D.C.Cir.1977); and *American Federation of Government Employees v. Pierce,* 697 F.2d 303 (D.C. Cir.1982) (per curiam)). Put another way, a Member of Congress may have standing where he alleges a " 'specific and cognizable' [injury] arising out of an interest 'positively identified by the Constitution.' " *United Presbyterian Church in the U.S.A. v. Reagan,* 738 F.2d 1375, 1381 (D.C.Cir.1984) (quoting *Moore v. United States House of Representatives,* 733 F.2d at 951).

Applying these standards to the instant case, we conclude that plaintiffs have alleged specific and cognizable injury sufficient to establish standing in their official capacities. The congressional plaintiffs claim that they are and will continue to be injured by the operation of the automatic deficit reduction process because it interferes with their "constitutional duties to enact laws regarding federal spending" and infringes upon their lawmaking powers under Article I, section 7. Accepting as true plaintiffs' allegations, as we must for purposes of determining their standing, the Act unconstitutionally gives to the Comptroller General and the President formal power to amend or repeal appropriations legislation that was lawfully passed, and thus effectively to nullify plaintiffs' votes on that earlier legislation. This claim of

injury is "specific" and "discernible"; and it arises out of an interest "identified by the Constitution," that is, a congressional interest in having all laws made in the manner prescribed under the general lawmaking provision contained in Article I, section 7. This interest differs significantly from the more abstract and generalized interest unsuccessfully asserted by lawmakers in *United Presbyterian Church in the U.S.A. v. Reagan,* 738 F.2d at 1375, and *Harrington v. Bush,* 553 F.2d at 190, *viz.,* the interest in preventing unlawful executive enforcement of a statute from "diminishing the effectiveness" of, or "nullifying," past votes on that statute. Permitting lawmakers to assert the latter interest would be tantamount to giving them standing to challenge the lawfulness of all executive action taken under a statute; entertaining the present suit would not.

Finally, we find no occasion to consider exercising the equitable discretion held by this Circuit's cases to justify denial of specific or declaratory relief to Members of Congress. Section 274 of the Act specifically provides for such relief to such plaintiffs, thus eliminating whatever equitable discretion might exist and leaving only the limitations of Article III.

### III

Plaintiffs contend that the Act's delegation to administrative officials of the power to make the economic calculations that determine the estimated federal deficit and hence the required budget cuts violates the constitutional provision vesting "all legislative power" in the Congress. *See* Art. I, § 1. It is strictly unnecessary for us to reach this point, since we hold in Part IV of this opinion that the challenged provisions of the Act are unconstitutional on other grounds. We think it appropriate, however, in light of the injunction of subsection 274(c) of the Act that we "expedite to the greatest possible extent the disposition" of these cases, and in light of the direct appeal to the Supreme Court provided by subsection 274(b), that we depart from normal prudential practice and provide our

views *obiter dicta.* We thereby avoid the necessity that the Supreme Court, if in its judgment the point must be reached, must either proceed without the usual benefit of a lower-court opinion or else delay final disposition by remanding for that purpose.

A

The delegation doctrine is rooted in the principle of separation of powers that underlies the three-branch system of government established by the Constitution. As the Supreme Court stated in *Field v. Clark,* 143 U.S. 649, 692, 12 S.Ct. 495, 504, 36 L.Ed.2d 294 (1892): "That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution."

In the first century and a half of the nation's history, however, the Court uniformly held that challenged statutes did not unconstitutionally delegate legislative power. *See, e.g., Federal Radio Commission v. Nelson Brothers Bond & Mortgage,* 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166 (1933); *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed.2d 624 (1928); *United States v. Grimaud,* 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911). As Chief Justice Taft explained in a passage that has become the classic exposition of the governing test, the separation-of-powers principle does not prevent the legislative branch from seeking the "assistance" of coordinate branches; "the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental coordination"; and so long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *J.W. Hampton,* 276 U.S. at 406, 409, 48 S.Ct. at 351, 352.

In 1935, however, the Court used the delegation doctrine to strike down portions of the National Industrial Recovery Act of 1933. *See A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). In these cases, the Court concluded that Congress had failed to articulate a policy or set of standards which would serve to confine the discretion of the individuals exercising the delegated authority. *See Schechter,* 295 U.S. at 541–42, 55 S.Ct. at 848; *Panama Refining,* 293 U.S. at 430, 55 S.Ct. at 252. These two cases are the only cases in which the Court has declared a statute unconstitutional by reason of undue delegation.[8]

In the fifty years since *Schechter* was decided, the Court has consistently rejected delegation challenges.[9] Nominally, it has

**8.** The delegation doctrine was also discussed by the Court in *Carter v. Carter Coal Co.,* 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936). There the Court ruled that a provision in the Bituminous Coal Conservation Act of 1935 which authorized various majorities of coal producers and mine workers to set maximum hours and minimum wages for all miners was unconstitutional. *Id.* at 311, 56 S.Ct. at 872. The Court denounced that provision as "legislative delegation in its most obnoxious form," but the Court's holding appears to rest primarily upon denial of substantive due process rights. *Id.*

**9.** *See, e.g., United States v. Mazurie,* 419 U.S. 544, 556–57, 95 S.Ct. 710, 717, 42 L.Ed. 706 (1975); *United States v. Sharpnack,* 355 U.S. 286, 297, 78 S.Ct. 291, 298, 2 L.Ed.2d 282 (1958); *District of Columbia v. John R. Thompson Co.,* 346 U.S. 100, 110, 73 S.Ct. 1007, 1012, 97 L.Ed. 1480 (1953); *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 542–44, 70 S.Ct. 309, 312–13, 94 L.Ed. 317 (1950); *Lichter v. United States,* 334 U.S. 742, 774–75, 68 S.Ct. 1294, 1311, 92 L.Ed. 1694 (1948); *Woods v. Cloyd W. Miller Co.,* 333 U.S. 138, 144–45, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948); *Fahey v. Mallonee,* 332 U.S. 245, 250, 67 S.Ct. 1552, 1554, 91 L.Ed. 2030 (1947); *American Power & Light Co. v. SEC,* 329 U.S. 90, 104–05, 67 S.Ct. 133, 141–42, 91 L.Ed. 103 (1946); *Bowles v. Willingham,* 321 U.S. 503, 516, 64 S.Ct. 641, 648, 88 L.Ed. 892 (1944); *Yakus v. United States,* 321 U.S. 414, 426, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944); *National Broadcasting Co. v. United States,* 319 U.S. 190, 226, 63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943); *Pittsburgh Plate Glass Co. v. NLRB,* 313 U.S. 146, 165, 61 S.Ct. 908, 918, 85 L.Ed. 1251 (1941); *Opp Cotton Mills, Inc. v. Administrator,* 312 U.S. 126, 146, 61 S.Ct. 524, 533, 85 L.Ed. 624 (1941); *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 397, 60 S.Ct. 907, 914, 84 L.Ed. 1263 (1940);

continued to apply the same test (as *Schechter* and *Panama Refining* themselves nominally applied the same test as *J.W. Hampton*), scrutinizing the challenged statutes for intelligible standards and statements of purpose which could provide guidance to the officials to whom authority was delegated. *See, e.g., Yakus v. United States,* 321 U.S. 414, 424–25, 64 S.Ct. 660, 88 L.Ed. 834 (1944); *Pittsburgh Plate Glass Co. v. NLRB,* 313 U.S. 146, 165–66, 61 S.Ct. 908, 918, 85 L.Ed. 1251 (1941); *Opp Cotton Mills, Inc. v. Administrator,* 312 U.S. 126, 144, 61 S.Ct. 524, 532, 85 L.Ed. 624 (1941); *United States v. Rock Royal Co-operative,* 307 U.S. 533, 574, 59 S.Ct. 993, 1013, 83 L.Ed. 1446 (1939). Pragmatically, however, the Court's decisions display a much greater deference to Congress' power to delegate, motivated in part by concerns that, "[i]n an increasingly complex society Congress obviously could not perform its functions if it were obliged to find all the facts subsidiary to the basic conclusions which support the defined legislative policy." *Opp Cotton Mills,* 312 U.S. at 145, 61 S.Ct. at 532. In *Yakus,* 321 U.S. at 425–26, 64 S.Ct. at 667–68, the Court noted:

It is no objection that the determination of facts and the inferences to be drawn from them in the light of the statutory standards and declaration of policy call for the exercise of judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework. . . .

. . . .

. . . Only if we could say that there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed, would we be justified in overriding its choice of means for effecting its declared purpose. . . .

The Supreme Court has endeavored to narrow the application of *Schechter* and

*Panama Refining* by noting that those cases involved "delegation of a power to make federal crimes of acts that never had been such before and to devise novel rules of law in a field in which there had been no settled law or custom," *Fahey v. Mallonee,* 332 U.S. 245, 249, 67 S.Ct. 1552, 1554, 91 L.Ed. 2030 (1947), and that *Schechter* concerned a statute which delegated regulatory power to private individuals, *see Yakus,* 321 U.S. at 424, 64 S.Ct. at 667. These attempts at narrowing the cases, and the Supreme Court's failure to use the delegation doctrine to strike down a statute in fifty years, have led some to conclude that the delegation doctrine is dead, or at least "moribund." *See National Cable Television Association v. United States,* 415 U.S. 336, 353, 94 S.Ct. 1146, 1156, 39 L.Ed.2d 370 (1974) (Marshall, J., dissenting). The Court has continued to use the doctrine, however, in an interpretive mode, finding that statutory texts conferring powers on the Executive should be construed narrowly where broader construction might represent an unconstitutional delegation. *See, e.g., Industrial Union Department v. American Petroleum Institute,* 448 U.S. 607, 646, 100 S.Ct. 2844, 2866, 65 L.Ed.2d 1010 (1980) (opinion of Stevens, J.); *National Cable Television Association,* 415 U.S. at 342, 94 S.Ct. at 1149; *Zemel v. Rusk,* 381 U.S. 1, 17–18, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965); *Kent v. Dulles,* 357 U.S. 116, 129, 78 S.Ct. 1113, 1119, 2 L.Ed.2d 1204 (1958). Such cases indicate that while the delegation doctrine may be moribund, it has not yet been officially interred by the Court.

Our analysis of the delegation challenged in the instant cases thus proceeds on the assumption that the delegation doctrine remains valid law, but that its scope must be determined on the basis of the deferential post-*Schechter* cases decided by the Supreme Court. We note, moreover, that the mode of analysis applied by the Supreme Court in this field relies substantially upon factual comparison of the delegation under

*United States v. Rock Royal Co-op.,* 307 U.S. 533, 574, 59 S.Ct. 993, 1013, 83 L.Ed. 1446 (1939); *Mulford v. Smith,* 307 U.S. 38, 48–49, 59 S.Ct.

648, 652, 83 L.Ed. 1092 (1939); *Currin v. Wallace,* 306 U.S. 1, 15, 59 S.Ct. 379, 386, 83 L.Ed. 441 (1939).

challenge with delegations previously adjudicated. *See, e.g., Woods v. Cloyd W. Miller Co.,* 333 U.S. 138, 144–46, 68 S.Ct. 421, 424–25, 92 L.Ed. 596 (1948); *American Power & Light Co. v. SEC,* 329 U.S. 90, 104–05, 67 S.Ct. 133, 141–42, 91 L.Ed. 103 (1946); *Opp Cotton Mills,* 312 U.S. at 146, 61 S.Ct. at 533; *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 398, 60 S.Ct. 907, 914, 84 L.Ed. 1263 (1940). With that teaching firmly in mind, we turn to the arguments raised by plaintiffs.

B

■ Plaintiffs advance a number of arguments that attempt to establish what might be termed *per se* nondelegability of the powers at issue here—as opposed to arguments, which we will discuss in the following section, going to deficiency in the standards governing the delegation. Plaintiffs begin by arguing that the type of authority delegated by the Act is "so central to the legislative function" that it may not be delegated. They cite the dictum of Chief Justice Marshall in support of the notion that there exist certain nondelegable "core functions" of Congress:

> The line has not been exactly drawn which separates those important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions, to fill up the details.

*Wayman v. Southard,* 23 U.S. (10 Wheat.) 1, 43, 6 L.Ed. 253 (1825). The legislative power over appropriations conferred by Article I, section 8, clause 1 and Article I,

section 9, clause 7 is said to constitute such a nondelegable "core function," particularly where the delegated authority could affect the functioning of a broad range of federal programs and, plaintiffs allege, would allow "unelected bureaucrats" to "override" portions of duly enacted appropriations laws.

We reject this "core functions" argument for several reasons. First, plaintiffs cite no case in which the Supreme Court has held *any* legislative power, much less that over appropriations, to be nondelegable due to its "core function" status. Indeed, in *Lichter v. United States,* 334 U.S. 742, 778–79, 68 S.Ct. 1294, 1313, 92 L.Ed. 1694 (1948), the Court stated flatly that "[a] constitutional power implies a power of delegation of authority under it sufficient to effect its purposes." Second, judicial adoption of a "core functions" analysis would be effectively standardless. No constitutional provision distinguishes between "core" and "non-core" legislative functions, so that the line would necessarily have to be drawn on the basis of the court's own perceptions of the relative importance of various legislative functions. Finally, if there were any nondelegable "core functions," there is no reason to believe that appropriations functions would be among them. The appropriations power is not functionally distinguishable from other powers successfully delegated by Congress,[10] and is particularly akin to the taxing power, which is similarly derived from Article I, section 8, clause 1 of the Constitution. In upholding a statute which delegated the latter power by permitting the President to determine whether to increase

---

**10.** The Supreme Court has, of course, frequently upheld delegation of regulatory authority under the commerce clause power. Delegations of authority conferred by many other constitutional provisions also have been sustained, however. It has been held, for example, that Congress properly delegated power over immigration, *see INS v. Chadha,* 462 U.S. 919, 953–54 n. 16, 103 S.Ct. 2764, 2785 n. 16, 77 L.Ed.2d 317 (1983); *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 542–44, 70 S.Ct. 309, 312–13, 94 L.Ed. 317 (1950); the power to determine what constitutes a federal crime, *see United States v. Sharp-*

*nack,* 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958); *United States v. Grimaud,* 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911); and the power to legislate for the District of Columbia, even though the Constitution describes that power as "exclusive" in Congress. *See District of Columbia v. John R. Thompson Co.,* 346 U.S. 100, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953). Moreover, in *Lichter,* 334 U.S. at 778–79, 68 S.Ct. at 1313, the Court stated that Congress' power to delegate "is especially significant in connection with constitutional war powers."

duties on certain articles in foreign commerce, the Supreme Court said:

It is conceded by counsel that Congress may use executive officers in the application and enforcement of a policy declared in law by Congress, and authorize such officers in the application of the Congressional declaration to enforce it by regulation equivalent to law. But it is said that this never has been permitted to be done where Congress has exercised the power to levy taxes and fix customs duties. The authorities make no such distinction. The same principle that permits Congress to exercise its rate making power in interstate commerce, by declaring the rule which shall prevail in the legislative fixing of rates, and enables it to remit to a ratemaking body created in accordance with its provisions the fixing of such rates, justifies a similar provision for the fixing of customs duties on imported merchandise.

*J.W. Hampton*, 276 U.S. at 409, 48 S.Ct. at 352; *see also Field v. Clark*, 143 U.S. at 680–94, 12 S.Ct. at 500–05.

The second contention that may be viewed as going to *per se* nondelegability of the authority conferred by the Act (though it is related to the issue of inadequate standards) concerns the breadth of the power allocated to administrative officials, which plaintiffs assert is constitutionally excessive. There is no doubt that the Act delegates broad authority, but delegation of similarly broad authority has been upheld in past cases. In *Yakus*, for example, the Court upheld a statute which delegated to an unelected Price Administrator the power "to promulgate regulations fixing prices of commodities." 321 U.S. at 420, 64 S.Ct. at 665. In *Bowles v. Willingham*, 321 U.S. 503, 512, 514–15, 64 S.Ct. 641, 646, 647, 88 L.Ed. 892 (1944), it upheld the delegation of power to institute rent controls on real property anywhere in the nation under specified circumstances. Finally, in *Amalgamated Meat Cutters v. Connally*, 337 F.Supp. 737, 745, 763 (D.D.C.1971), a three-judge district court upheld a delegation of authority to the President "to issue such orders and regulations as he

deems appropriate to stabilize prices, rents, wages and salaries." The authority conferred by the present Act, which permits administrators to affect spending levels for a specified range of federal programs, and only to a certain degree, seems to us no broader than these delegations that have been upheld. We think, in any event, that the ultimate judgment regarding the constitutionality of a delegation must be made not on the basis of the scope of the power alone, but on the basis of its scope *plus* the specificity of the standards governing its exercise. When the scope increases to immense proportions (as in *Schechter*) the standards must be correspondingly more precise. As we shall see, the standards governing the power here are much more specific than in the cases just described.

■ Nor is it the law, as plaintiffs assert, that a broad delegation such as this must be supported by some rigorous "principle of necessity" which is allegedly not met here because Congress has exercised sole power over appropriations in the past and presumably could continue to do so. To be sure, in delegation cases the Supreme Court has occasionally recognized the "necessity" for a delegation. *See, e.g., Buttfield v. Stranahan*, 192 U.S. 470, 496, 24 S.Ct. 349, 355, 48 L.Ed.2d 525 (1904). It is doubtful, however, that the word "necessity" in that context, any more than the word "necessary" in the "necessary and proper" clause of the Constitution, refers to an "absolute physical necessity." *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413–15, 4 L.Ed. 579 (1819). Rather, necessity refers to a strong utility and convenience, which can certainly be considered to exist here. In any case, while "necessity" has been noted by the Court in upholding a delegation, "lack of necessity" has never been invoked to strike one down. The same response may be made to plaintiffs' argument based upon what they consider the long (six-year) duration of the present broad delegation: while extremely limited duration has been invoked as one of the elements sustaining a delegation, lengthy duration has never been held to

render one void. The delegations upheld in *J.W. Hampton*, 276 U.S. at 394, 48 S.Ct. at 348, and *Field v. Clark*, 143 U.S. at 649, 12 S.Ct. at 495, for example, were for indefinite terms.

■ Finally, plaintiffs argue that the present delegation is *per se* invalid because it allows administrators to "nullify" or "override" laws. Again we disagree. The Supreme Court previously has upheld delegations which permit officials to determine when, if ever, a law should take effect. *See, e.g., Rock Royal Co-operative*, 307 U.S. at 577–78, 59 S.Ct. at 1014–15; *Currin v. Wallace*, 306 U.S. 1, 15–16, 59 S.Ct. 379, 386–87, 83 L.Ed. 441 (1939); *Field v. Clark*, 143 U.S. at 693, 12 S.Ct. at 504; *The Cargo of the Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382, 388, 3 L.Ed. 378 (1812). In such cases, the Court classifies Congress' action as legislating in contingency. The instant Act is no more than a form of such contingent legislation. Throughout the Act, Congress has stipulated that the full effectiveness of all appropriations legislation enacted for fiscal years 1986 to 1991 will be contingent upon the administrative determination whether all appropriated funds, when measured against revenues, result in a budget deficit in excess of required target figures. Viewed in this context, the authority delegated by the Act does not differ in kind from that approved in prior cases.

### C

■ We come, then, to what is the plaintiffs' principal argument on the excessive delegation point: that because of the lack of standards and the inherent imprecision of the duties conferred upon the administrators, the Act fails adequately to confine the exercise of administrative discretion. The search for adequate standards to restrict administrative discretion lies at the heart of every delegation challenge. The essential inquiry is whether the specified guidance "sufficiently marks the field within which the Administrator is to act so that it may be known whether he has kept within it in compliance with the legislative will." *Yakus*, 321 U.S. at 425, 64 S.Ct. at 668.

Our consideration of this objection requires a careful review of the statute. The Act begins by establishing a "maximum deficit amount" for each fiscal year between 1986 and 1991. Act § 201(a)(1). It then requires the Directors of the OMB and the CBO to estimate the anticipated "budget base levels of total revenues and budget outlays" for a given fiscal year, to determine whether the projected deficit for that year will exceed the maximum deficit amount for that year by more than a specified amount, and to estimate the rate of real economic growth that will occur during that fiscal year, as a whole and by quarters, and the rate of real economic growth that occurred during each of the last two quarters of the preceding fiscal year. *Id.* § 251(a)(1). The Directors are then jointly to report their conclusions to the Comptroller General. *Id.* § 251(a)(2).[11]

The Comptroller General is instructed to "review and consider the report" and, "with due regard for the data, assumptions, and methodologies used in reaching the conclusions set forth therein," issue his own report making the same type of estimates and determinations contained in the Directors' report. Act § 251(b)(1)–(2). The Comptroller General's report is to "be based on the estimates, determinations, and specifications of the Directors and shall utilize the budget base, criteria, and guidelines set forth" in specified sections of the Act. *Id.* § 251(b)(1). The report must "fully explain" any differences between its determinations and those included in the report of the Directors. *Id.* § 251(b)(2).[12]

---

**11.** These conclusions all contribute to the calculation of whether the estimated deficit for a given fiscal year exceeds the maximum deficit amount by more than the amount specified in § 251(a)(1)(B) of the Act. Only if it does so will the Directors recommend spending reductions. *See* Act § 251(a)(2). Plaintiffs do not challenge the procedure by which the administrators are to allocate the spending reductions necessary to reduce the deficit excess.

**12.** In fiscal years 1987–1991, the Directors and the Comptroller General are required to submit revised reports under § 251(c) of the Act. We

In considering whether this scheme contains constitutionally adequate legislated standards, we first observe that it does set forth specific assumptions that are to be used in calculating the budget base. *See* Act § 251(a)(6). The administrative officials are directed to assume, with some specified exceptions, "the continuation of current law in the case of revenues and spending authority," *id.* § 251(a)(6)(A), (C) [13] and, in all areas to which the preceding assumption is inapplicable, "appropriations equal to the prior year's appropriations except to the extent that annual appropriations or continuing appropriations for the entire fiscal year have been enacted." *Id.* § 251(a)(6)(B). They must assume that "expiring provisions of law providing revenues and spending authority ... do expire, except that excise taxes dedicated to a trust fund and agricultural price support programs administered through the Commodity Credit Corporation are extended at current rates." *Id.* § 251(a)(6)(C). Additionally, they must assume that "Federal pay adjustments for statutory pay systems" will be as recommended by the President and will not result in pay reductions and that Medicare spending levels for inpatient hospital services will be based upon specified regulations. *Id.* § 251(a)(6)(D).

Finally, certain spending deferrals proposed by the President are not to be included in the calculation. *Id.* All of these directions relate to the required calculation of "budget base levels of total revenues and total budget outlays" for a fiscal year.

The Act provides further guidance and limitation by way of definition. The "real economic growth" to be calculated is defined as "the growth in the gross national product during such fiscal year, adjusted for inflation, consistent with Department of Commerce definitions." Act § 257(6). "Budget outlays" and "budget authority" are defined by reference to provisions of the Congressional Budget and Impoundment Control Act of 1974.[14] "Deficit" is defined as "the amount by which total budget outlays for such fiscal year exceed total revenues for such fiscal year." *Id.* §§ 257(4), 201(a)(1). Moreover, the latter definition provides certain criteria for calculation of the deficit. *See id.* § 201(a)(1).[15]

These required assumptions and definitions are given additional meaning by reference to years of administrative and congressional experience in making similar economic projections and calculations under the Congressional Budget Act of 1974.[16]

---

disregard that refinement for present purposes, since the types of determinations to be made in those revised reports do not differ from those required to be made in the initial reports.

**13.** "Spending authority" is defined by reference to the Congressional Budget Act of 1974, Pub.L. No. 93–344, 88 Stat. 297 (codified in relevant part as amended at 2 U.S.C. §§ 631–661 (1982)). The relevant provision states that "spending authority" means temporary or permanent authority related to government contractual obligations, the incurring of indebtedness, and the making of certain payments, such as for loans and grants, if such budget authority is "not provided for in advance by appropriations Acts." 2 U.S.C. § 651(c)(2). "Spending authority" does not include authority "to insure or guarantee the repayment of indebtedness incurred by another person or government." *Id.* § 651(c).

**14.** Pub.L. No. 93–344, 88 Stat. 297 (codified in relevant part as amended at 2 U.S.C. §§ 621–688 (1982)). "Budget outlays" means, "with respect to any fiscal year, expenditures and net lending

of funds under budget authority during such year." 2 U.S.C. § 622(1). "Budget authority" means "authority provided by law to enter into obligations which will result in immediate or future outlays involving Government funds, except that such term does not include authority to insure or guarantee the repayment of indebtedness incurred by another person or government." *Id.* § 622(2).

**15.** These criteria relate, *inter alia*, to treatment of Social Security funds and the "receipts, revenues, disbursements, budget authority, and outlays of each off-budget Federal entity." Act § 201(a)(1).

**16.** Under the 1974 Act, the CBO is required to perform a number of economic calculations. For example, near the beginning of each fiscal year, it must issue a report projecting for five fiscal years the total new budget authority and total budget outlays for each fiscal year in that period, revenues to be received in each fiscal year, the anticipated surplus or deficit, and the amount of "tax expenditures." 2 U.S.C. § 639(c) (1982).

The present Act's references to the 1974 Act and to Department of Commerce regulations manifest Congress' intent that past practice should inform the administrators' calculations. The standards set by this Act thus "derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear." *American Power & Light Co.*, 329 U.S. at 104, 67 S.Ct. at 142; *see also Lichter*, 334 U.S. at 785, 68 S.Ct. at 1316 ("Standards prescribed by Congress are to be read in the light of the conditions to which they are to be applied."); *Amalgamated Meat Cutters*, 337 F.Supp. at 748 (standards set by statute are defined in part by consideration of experience under previous wage and price stabilization statutes). Additionally, we note that the economic calculation standards, which might seem vague and confusing to laymen, will have more precise meaning to officials accustomed to making such determinations. Here, as in *Sunshine Anthracite Coal Co.*, 310 U.S. at 398, 60 S.Ct. at 915, "in the hands of experts the criteria which Congress has supplied are wholly adequate for carrying out the general policy and purpose of the Act."

We are of the clear view that the totality of the Act's standards, definitions, context, and reference to past administrative practice provides an adequate "intelligible principle" to guide and confine administrative decisionmaking. It is unquestionably true, as plaintiffs point out, that in making the assessments of current facts and the predictions of future facts that the statute requires, a good deal of judgment is involved, and different individuals faithfully seeking to follow Congress' instructions may reach different results. Nevertheless, the discretion involved in assessing current facts and predicting future ones is inseparable from administration of the law, and it is one of the reasons we consider it important to elect our Chief Executive. If the

facts and predictions here are difficult to ascertain, they are no more so than many others committed to the charge of administrative officials, such as the complex economic calculations required of the agencies that determine the discount rate, the consumer price index, and the gross national product. What is significant about this case, and what distinguishes it from many other cases in which delegation has been upheld, is that the *only* discretion conferred is in the ascertainment of facts and the prediction of facts.[17] The Comptroller General is not made responsible for a single *policy* judgment as to, for example, what is a "fair price," *see Yakus*, 321 U.S. at 414, 64 S.Ct. at 660, or when it would be "appropriate" to freeze wages and prices, *see Amalgamated Meat Cutters*, 337 F.Supp. at 737, or wherein lies the "public interest," *see National Broadcasting Co. v. United States*, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). Compared with the cases upholding administrative resolution of such issues, the present delegation is remote from legislative abdication. Congress "is not confined to that method of executing its policy which involves the least possible delegation of discretion to administrative officials." *Yakus*, 321 U.S. at 425–26, 64 S.Ct. at 667–68.

### D

■ Finally, we consider plaintiffs' argument that the delegation is unlawful because of the preclusion of judicial review. Section 274(h) of the Act provides that "[t]he economic data, assumptions, and methodologies used by the Comptroller General in computing the base levels of total revenues and total budget outlays ... shall not be subject to review in any judicial or administrative proceeding." This is of course not a total preclusion of judicial review with respect to all action taken under the Act. It does not restrict the bringing of constitutional challenges; indeed, in

---

**17.** Of course the Comptroller General must interpret the law in applying the provisions of the Act, a point that will be relevant to the separation-of-powers discussion in Part IV of this opinion. Whether or not that power can appropri-

ately be considered a "discretion," it is necessarily possessed by all officers charged with administration of the law and therefore cannot possibly cause problems of unconstitutional delegation.

subsection 274(a), the Act endeavors to facilitate this type of judicial review by broadly designating those who may bring such suits. In addition, subsection 274(g) preserves the rights guaranteed by other laws; thus, there is nothing to prevent a court from determining whether the operation of the Act improperly infringes upon such rights. Moreover, by its terms, subsection 274(h) would not prevent a court from determining whether the Comptroller General failed to make one of the assumptions required by subsection 251(a)(6). Additionally, since the judicial review preclusion extends only to determination of "base levels of total revenues and total budget outlays," a court presumably could determine whether the Comptroller General had complied with the deficit calculation criteria contained in subsection 201(a)(1). Nor are courts precluded from considering whether any allocation of spending reductions is made pursuant to statutory standards. Finally, the Act expressly provides for review of the presidential sequestration orders to determine their compliance with statutory requirements. *See* Act § 274(d).

The Act does insulate, however, those exercises of judgment by the Comptroller General that the plaintiffs challenge and that we have approved above. Plaintiffs argue that a condition of the validity of, if not all delegations, at least a delegation as broad as that here at issue, is the availability of judicial review of its exercise. We do not agree. To be sure, the Supreme Court has sometimes alluded to the availability of judicial review in its catalogue of factors such as "necessity" and "limited duration," discussed above, validating the delegation. In *Opp Cotton Mills*, for example, it said that

> where ... the standards set up for the guidance of the administrative agency, the procedure which it is directed to follow and the record of its action which is required by statute to be kept or which is in fact preserved, are such that Congress, *the courts* and the public can ascertain whether the agency has conformed to the standards which Congress

has prescribed, there is no failure of performance of the legislative function.

312 U.S. at 144, 61 S.Ct. at 532 (emphasis added). And more recently, in *INS v. Chadha*, it noted in dictum that the exercise of delegated authority "is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review as well as the power of Congress to modify or revoke the authority entirely." 462 U.S. at 953–54 n. 16, 103 S.Ct. at 2785 n. 16.

These allusions cannot be thought to establish the principle that judicial review is essential to sustain a delegation, since the exercise of many validly delegated authorities is statutorily insulated from judicial review. *See, e.g., Southern Railway v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 454–64, 99 S.Ct. 2388, 2394–99, 60 L.Ed.2d 1017 (1979) (construing provision of Interstate Commerce Act); *Thompson v. Clark*, 741 F.2d 401, 404–05 (D.C.Cir.1984) (construing provision of Regulatory Flexibility Act). Even the more limited principle that judicial review can "save" a delegation that would otherwise be invalid is questionable, since if the requisite minimum standards have in fact not been established by Congress, permitting them to be invented by the courts rather than by the administrator is *no less* a delegation of political power, and arguably a worse one, since it is to a nonpolitical branch, and a branch even less subject to congressional controls. In any event, since we do not regard the present delegation as close to the line of invalidity, and since judicial review of almost all of the administrative determinations remains available, we find that insulating from judicial review the "economic data, assumptions, and methodologies used ... in computing the base levels of total revenues and total budget outlays" provides no basis for finding the delegation invalid.

\* \* \* \* \* \*

In sum, our review of the aggregate effect of the factors identified by the plaintiffs leads us to conclude that the delegation made by the Act passes constitutional

muster. Apart from the technicalities of the matter, the realities produce the same conclusion. It seems to us not true, as plaintiffs have asserted, that Congress has declined to make the "hard political choices." To the contrary, it has decided to impose the severe constriction of federal spending necessary to produce a balanced budget by fiscal year 1991, it has established an intricate administrative mechanism to address that goal, and it has specified in meticulous detail which program budgets will be reduced in order to achieve that result, and by how much. *See generally* Act §§ 251(a)(3), 255, 256. All that has been left to administrative discretion is the estimation of the aggregate amount of reductions that will be necessary, in light of predicted revenues and expenditures, and we believe that the Act contains standards adequately confining administrative discretion in making that estimation. While this is assuredly an estimation that requires some judgment, and on which various individuals may disagree, we hardly think it is a distinctively *political* judgment, much less a political judgment of such scope that it must be made by Congress itself. Through specification of maximum deficit amounts, establishment of a detailed administrative mechanism, and determination of the standards governing administrative decisionmaking, Congress has made the policy decisions which constitute the essence of the legislative function. It "has defined the circumstances when its announced policy is to be declared opera-

tive and the method by which it is to be effectuated. Those steps constitute the performance of the legislative function in the constitutional sense." *Bowles v. Willingham*, 321 U.S. at 514, 64 S.Ct. at 647. Accordingly, plaintiffs' delegation challenge is rejected.

### IV

We turn to the next major objection to the Act's automatic deficit reduction process, pressed in particular by the United States: that the role of the Comptroller General in that process is invalid because he does not possess the constitutional qualifications to perform it.[18] The objection takes various forms, but the only one we find it necessary to address is the contention that the Act confers upon the Comptroller General powers which are executive in nature, and which therefore cannot be conferred upon an officer who lacks the degree of independence from Congress that their exercise constitutionally requires. Specifically, the government objects to the fact that the Comptroller General, while appointed by the President with the advice and consent of the Senate, is removable not only by impeachment (as are all officers of the United States) but also by joint resolution of Congress for specified causes, including inefficiency and neglect of duty.[19]

### A

Three threshold objections are raised to our consideration of this issue as

---

**18.** It is argued by some of the plaintiffs that the Act in reality confers power not upon the Comptroller General but rather upon the Directors of the OMB and the CBO, whose joint report the Comptroller General assertedly will "rubberstamp." We find that assertion unconvincing, and thus direct our attention to the separation-of-powers concerns raised by the Comptroller General's formal powers under the Act. Of course, if it were true and relevant that the exercise of those powers would effectively be dictated by the Directors, our conclusion that the Act unconstitutionally vests executive powers in an official removable in a manner inconsistent with the exercise of such powers would be *a fortiori* correct, because the Director of the CBO is removable by resolution of either House. *See* 2 U.S.C. § 601(a)(4) (1982).

**19.** The provision of law governing the Comptroller General's removal reads as follows:

A Comptroller General or Deputy Comptroller General retires on becoming 70 years of age. Either may be removed at any time by—
(A) impeachment; or
(B) joint resolution of Congress, after notice and an opportunity for a hearing, only for—
(i) permanent disability;
(ii) inefficiency;
(iii) neglect of duty;
(iv) malfeasance; or
(v) a felony or conduct involving moral turpitude.
31 U.S.C. § 703(e)(1) (1982).

a basis for invalidating the automatic deficit reduction process. First, intervenors argue that, until removal is attempted, the issue of the effect of the Comptroller General's removability upon his powers is not ripe for adjudication. This argument is flatly contradicted by the decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). There the Supreme Court adjudicated (and in fact found meritorious) the claim that bankruptcy judges who were appointed to fixed fourteen-year terms, subject to removal for cause by the judicial council of the circuit in which they served, and whose salaries were not immune from possible diminution, could not constitutionally exercise certain of the powers granted them by the Bankruptcy Act of 1978—notwithstanding the fact that no removal or salary diminution had been attempted. 458 U.S. at 60–61, 87, 102 S.Ct. at 2865–66, 2880 (plurality opinion).

Intervenors seek to distinguish *Northern Pipeline* on the asserted ground that the Court focused its attention on what they describe as the constitutionally defective tenure provision that had already been exercised (*viz.*, under their analysis, the provision appointing bankruptcy judges to a fixed term), rather than the ones that had not yet been exercised (*viz.*, the provisions permitting removal during the fixed term and reduction of salary). As a factual matter, the assertion is not true. The *Northern Pipeline* Court focused no more of its attention on the fixed-term provision than on the removal-for-cause provision or the absence of statutory protection against diminution in salary; it simply noted all three problems, drawing no distinction among them on "ripeness" or any other grounds. *Northern Pipeline*, 458 U.S. at 60–61, 102 S.Ct. at 2865–66. Moreover, the very notion that the constitutional vice in *Northern Pipeline* had been "exercised," while in the present case the asserted constitutional vice has not been, strikes us as little more than semantic legerdemain. In the same sense in which the bankruptcy judges had already been appointed to positions with a fixed term, the Comptroller General has already been appointed to a position subject to congressional removal; and in the same sense that the congressional removal provision has not yet been applied in this case, neither had the provision requiring judges to step down after fourteen years in *Northern Pipeline*. It is true, of course, that the expiration of fourteen years was certain to occur while in the present case congressional removal is not. But that is quite irrelevant to whether the two provisions differ in their immediate impact, so that one is more "ripe" for review than the other. The immediate impact in *Northern Pipeline* came not from the certainty of expiration of fourteen years, but from the bankruptcy judge's awareness of the possibility of non-reappointment. It is his presumed desire to avoid that possibility by pleasing the appointing power, just as in the present case it is the Comptroller General's presumed desire to avoid removal by pleasing Congress, which creates the here-and-now subservience to another branch that raises separation-of-powers problems.[20]

**20.** Intervenors also seek to find support for their ripeness argument in *Clark v. Valeo*, 559 F.2d 642 (D.C.Cir.) (en banc) (per curiam), *aff'd mem.*, 431 U.S. 950, 97 S.Ct. 2667, 53 L.Ed.2d 267 (1977), and *Muller Optical Co. v. EEOC*, 743 F.2d 380 (6th Cir.1984). It is not there. *Clark*, to be sure, rejected a challenge to a legislative veto provision as unripe because the provision had not been exercised. But *Clark* involved a naked attack upon the provision itself and not, like the present case, a challenge to present use of the statutory powers to which the provision was attached. And *Muller*, which *did* address a challenge comparable to the present case, implicitly rejects rather than supports intervenors'

ripeness argument, deciding *on the merits* a claim that the existence of an unexercised legislative veto provision in a statute rendered actions taken under that statute unconstitutional. *Muller*, 743 F.2d at 388. *See also Alaska Airlines, Inc. v. Donovan*, 766 F.2d 1550 (D.C.Cir. 1985) (holding on the merits that the existence of an unexercised legislative veto provision in a statute would render invalid actions taken under the statute unless the legislative veto provisions were severable from the portion of the statute pursuant to which the challenged actions were taken), *petition for cert. filed*, 54 U.S.L.W. 3394 (U.S. Nov. 27, 1985) (No. 85–920).

■ The second threshold argument, made by the Senate, is that, since the manner of removal that the Comptroller General's tenure statute embodies [21] is functionally the same as new legislation, there is no more reason for us to consider whether the existence of that tenure statute invalidates the present Act than there would be to consider, in the absence of such a statute, whether the possibility of Congress' passing a law removing the Comptroller General would invalidate the Act. We disagree. Insofar as justiciability and ripeness are concerned, the mere possibility that Congress might seek to remove an officer is no more comparable to its formal assertion (by legislation) of the power to do so, than is the mere possibility of an agency's punishing certain conduct comparable to its formal assertion (by rule) of the power to do so. *Cf. Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). It is the prior assertion of authority to remove embodied in the tenure statute that has the immediate effect, and presumably the immediate purpose, of causing the Comptroller General to look to the legislative branch rather than the President for guidance. And it is this, in turn, that constitutes the asserted evil of which the plaintiffs complain. The logic of the Comptroller General's argument leads to the conclusion that a tenure statute providing for removal of a judge exercising Article III powers by joint resolution could similarly not be challenged, a prospect we are not prepared to entertain.

■ Intervenors' last threshold argument is that, even if the powers granted to the Comptroller General under the Act cannot be conferred upon an officer removable by Congress, that conclusion does not necessarily invalidate the Act, but rather requires us to choose *which* of the two incompatible provisions (the powers in the Act or the removal authority) should be set aside. That decision, they assert, should turn primarily upon our estimation of which of the two provisions Congress would have wished to survive—which they maintain is the Act.

Intervenors do not refer us to, nor are we aware of, any case in which a court confronted with separate statutes, constitutionally incompatible in combination, has even considered choosing which of the two to invalidate, much less resolved that choice as intervenors suggest. To the contrary, as the cases specifically involving incompatible authorization and tenure (or appointment) statutes amply demonstrate, the courts set aside that statute which either allegedly prohibits or allegedly authorizes the injury-in-fact that confers standing upon the plaintiff. *See Springer v. Government of the Philippine Islands,* 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928) (removing from office, in *quo warranto* proceeding brought by Philippine Governor-General, officials exercising executive power but appointed by officers of Philippine legislature); *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (setting aside tenure-of-office statute that was the basis of postmaster's claim of unlawful presidential removal). Indeed, the Supreme Court has taken that approach even when the incompatible authorization and removal (or appointment) provisions are contained within *the same* enactment. *See Northern Pipeline,* 458 U.S. at 50, 102 S.Ct. at 2860 (setting aside exercise of adjudicatory authority over plaintiff by bankruptcy judge who lacked Article III life tenure); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) (setting aside Federal Election Campaign Act provisions granting authority over plaintiffs to officials appointed in a manner incompatible with the exercise of such authority).

---

**21.** The statute provides for removal by joint resolution, which requires either presidential approval or passage by a two-thirds vote of both Houses of Congress over a presidential veto. In assessing the compatibility of such a provision with the constitutional doctrine of separation of powers, we think it most appropriate to focus our attention on the latter possibility—that Congress could remove the Comptroller General despite presidential opposition—and we therefore refer to the provision as authorizing congressional removal.

Even if we were to agree, however, that when confronted with two separate provisions that cannot both be constitutionally sustained, we are free to choose between them, and are to make our choice on the basis of presumed congressional intent, we would conclude that in the present case it is the grant of powers under the Act that would have to fall. As the brief of Intervenor Speaker and Bipartisan Leadership Group of the House meticulously details, the grant of authority to the Comptroller General was a carefully considered protection against what the House conceived to be the pro-executive bias of the OMB. It is doubtful that the automatic deficit reduction process would have passed without such protection, and doubtful that the protection would have been considered present if the Comptroller General were not removable by Congress itself—much less if he were removable (as validation of his functions under this legislation might constitutionally require, a point we do not reach) at the discretion of the President, like the Director of the OMB himself.

A congressional intent that it is the Comptroller General's powers under this Act, rather than his manner of removal, that should yield if both cannot coexist is also strongly suggested by the fallback deficit reduction process specifically established by the Act to take effect if the automatic deficit reduction process is declared constitutionally infirm—especially since it is clear that one of the grounds of possible infirmity specifically brought to

Congress' attention by the executive branch was the participation of the Comptroller General.[22] By reason of that fallback process, we might add, setting aside the grant of powers to the Comptroller General would result in a state of affairs that Congress unquestionably was willing to accept, whereas congressional acceptance of an automatic deficit reduction process administered by a Comptroller General unremovable by Congress (and perhaps removable at will by the President) is purely speculative. Indeed, even apart from the fallback process a decision setting aside the grant of powers under this Act rather than the separate statutory provision for the Comptroller General's removal would run much less risk of frustrating congressional intent. We have no idea how many powers of the Comptroller General, conferred upon him by other statutes, would not have been conferred if he were not subject to congressional removal.

We conclude, therefore, that the question whether the powers conferred upon the Comptroller General by the Act are constitutionally incompatible with his removability from office by Congress is ripe for our consideration; and that an affirmative answer requires invalidation of those powers. We turn to the merits of this issue.

B

The only portions of the Constitution explicitly addressing the power to remove officers of the United States [23] are the im-

---

22. *See Statement on Signing H.J. Res. 372 Into Law*, 21 Weekly Comp. Pres. Doc. 1490–91 (Dec. 12, 1985) ("[E]xecutive functions may only be performed by officers in the executive branch. The ... Comptroller General [is an] agent[ ] of Congress, not [an] officer[ ] in the executive branch.... My administration alerted Congress to [this] ... problem[ ] throughout the legislative process in an effort to achieve a bill free of constitutionally suspect provisions.... [W]e were unsuccessful in this goal....").

23. "Officers" are to be distinguished from "employees," *see Buckley v. Valeo*, 424 U.S. at 126 & n. 162, 96 S.Ct. at 685 & n. 162, as to whom the congressional power to restrict or impose removal may be quite different. The distinction is not relevant to the present case, however,

since it is conceded that the Comptroller General is an officer. There may also be a difference, at least insofar as Congress' ability to restrict the President's removal power is concerned, between those officers included within the meaning of the phrase "inferior Officers" in the appointments clause of the Constitution, whose manner of appointment that clause permits to be controlled to some degree by Congress (*viz.*, to be vested "in the President alone, in the Courts of Law, or in the Heads of Departments," Art. II, § 2, cl. 2); and other officers, whom the appointments clause requires to be appointed by the President with the advice and consent of the Senate, *id. See, e.g., Myers*, 272 U.S. at 158–64, 47 S.Ct. at 39–41; *United States v. Perkins*, 116 U.S. 483, 484–85, 6 S.Ct. 449, 450, 29 L.Ed. 700 (1886) (dictum). That distinction also is not

peachment clauses, which provide that "The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors," Art. II, § 4, and that the House of Representatives shall bring, and the Senate try, the impeachment, Art. I, § 2, cl. 5; Art. I, § 3, cl. 6. The appointments clause of the Constitution, which it is universally agreed has some bearing upon removal powers, reads as follows:

> ... [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

Art. II, § 2, cl. 2.

Since the early days of the Republic it has not been doubted that the Constitution implicitly confers upon the President power to remove civil officers whom he appoints, at least those who exercise executive powers. In what has come to be known in the legal literature as the "Decision of 1789," the First Congress, after heated debate, deleted from a proposed bill creating the Department of Foreign Affairs language which provided that the Secretary of Foreign Affairs was "to be removable from office by the President." The reason urged by the proponents of the deletion was that the original text implied the absence of a constitutionally conferred power

of the President to effect the removal. *See Myers*, 272 U.S. at 111–36, 47 S.Ct. at 23–30.

The extent to which the implicit presidential removal power extends beyond officers exercising executive powers, however, the extent to which it can be restricted by legislation, and the extent to which it can be conferred by legislation upon the Congress itself, have been the subject of Supreme Court pronouncements that are conflicting in their reasoning, if not in their results. *See generally* Burkoff, *Appointment and Removal under the Federal Constitution: The Impact of Buckley v. Valeo*, 22 Wayne L.Rev. 1335 (1976); Donovan & Irvine, *The President's Power to Remove Members of Administrative Agencies*, 21 Cornell L.Q. 215 (1936). The cases are few enough that their holdings and their principal rationales may be readily summarized.

In *In re Hennen*, 38 U.S. (13 Pet.) 230, 10 L.Ed. 138 (1839), the Court held that a district court clerk, who had been appointed by a district court judge pursuant to that provision of the Constitution authorizing Congress to vest the appointment of "inferior Officers ... in the Courts of Law," could also be removed by a district court judge. The Court said that "[i]n the absence of all constitutional provision or statutory regulation, it would seem to be a sound and necessary rule, to consider the power of removal as incident to the power of appointment." *Id.* at 259.

In *United States v. Perkins*, 116 U.S. 483, 6 S.Ct. 449, 29 L.Ed. 700 (1886), the Court upheld an award of back pay to a cadet-engineer in the Navy, who had been appointed by the Secretary of the Navy and was dismissed by him in disregard of a statutory provision prohibiting dismissal of

---

pertinent here, since no one .contends, and it seems to us not seriously maintainable, that the Comptroller General is an "inferior Officer." Finally, there may be a distinction between "officers of the United States" and "officers of Congress," *see Buckley v. Valeo*, 424 U.S. at 127–28, 96 S.Ct. at 686. Although it is not conceded that the Comptroller General comes within the former category (the government vigorously asserts the contrary), we find it unnecessary to decide the question, since if the Comptroller General is not an officer of the United States he is *a fortiori* unable to exercise the executive powers we find him unable to exercise on narrower grounds. Our analysis assumes, in other words, the more validating characterization of the office.

any naval officer in peacetime except by court martial. The Court quoted and approved the opinion of the Court of Claims stating that, regardless of what the situation might be with regard to officers appointed by the President by and with the advice and consent of the Senate under the self-operative provision of the Constitution,

> "when Congress, by law, vests the appointment of inferior officers in the heads of Departments it may limit and restrict the power of removal as it deems best for the public interest. The constitutional authority in Congress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as Congress may enact in relation to the officers so appointed."

*Id.* at 485, 6 S.Ct. at 450.

In *Shurtleff v. United States*, 189 U.S. 311, 23 S.Ct. 535, 47 L.Ed. 828 (1903), the Court held that a statute which provided that a particular Customs Department official "may be removed from office at any time by the President for inefficiency, neglect of duty, or malfeasance in office" did not prevent presidential removal for other reasons, since such a limitation would have to be stated in "very clear and explicit language," *id.* at 315, 23 S.Ct. at 536. The Court did not confront, therefore, the issue of whether such a limitation would be constitutional.

In *Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926), the Court finally dealt with the constitutionality of a statutory provision giving Congress a role in the removal process. The plaintiff was a postmaster, appointed by the President with the advice and consent of the Senate, for a four-year term; he was dismissed by the President despite a tenure-of-office act requiring advice and consent of the Senate for his removal. The Court found the limitation unconstitutional in a 71-page opinion by Chief Justice Taft exhaustively examining the historical record bearing upon the meaning of the applicable constitutional texts. The nub of the analysis is that, as the Decision of 1789 in the Court's view established, and as *In re Hennen* had held,

"the power of removal [is] incident to the power of appointment," 38 U.S. (13 Pet.) at 259. The Constitution gives Congress no authority to limit that removal power, except, implicitly, in the provision authorizing Congress to provide for the appointment of inferior officers by means other than the constitutionally prescribed method of presidential appointment with Senate consent. At least where it exercises that authority in such fashion as to vest appointment in the head of a department, it "may prescribe incidental regulations controlling and restricting the [appointing officer] in the exercise of the power of removal." 272 U.S. at 161, 47 S.Ct. at 40. Even in the latter situation, the Court added, for Congress to "draw to itself, or to either branch of it, the power to remove or the right to participate in the exercise of that power . . . would be ... to infringe the constitutional principle of the separation of governmental powers." *Id.* The opinion clearly regarded its holding as applicable to officers whose functions include "duties of a quasi-judicial character," *id.* at 135, 47 S.Ct. at 31, including specifically the commissioners of the Interstate Commerce Commission, *see id.* at 171–72, 47 S.Ct. at 43–44.

The next case, decided nine years later, warrants more extended attention, since it is the last major discussion by the Supreme Court of the constitutional authority of Congress over power of removal. *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), was a suit for back pay by a commissioner of the Federal Trade Commission whom President Roosevelt had removed without cause. The Federal Trade Commission Act provided that commissioners "may be removed by the President for inefficiency, neglect of duty, or malfeasance in office." The Court's opinion, by Justice Sutherland, first found that this language, unlike the virtually identical language involved in *Shurtleff,* did bar removal for other causes, distinguishing the earlier case on the basis that the office there involved had no term of appointment, whereas Federal

Trade Commissioners were limited to a term of seven years. *Humphrey's Executor,* 295 U.S. at 619–26, 55 S.Ct. at 870–73. Then, in six pages addressing the constitutional issue—two of which were spent discussing why the facts of *Myers* were distinguishable—the opinion swept away much of the reasoning of *Myers* (precisely how much is one of the issues before us) and simultaneously revolutionized separation-of-powers analysis. The Court said that the holding of *Myers* extended only to "purely executive officers," and that the constitutional prohibition it expressed did not apply to an officer like the Federal Trade Commissioner, who "occupies no place in the executive department and who exercises no part of the executive power vested by the Constitution in the President," but acts only "in the discharge and effectuation of ... quasi-legislative [24] or quasi-judicial powers, or as an [officer of an] agency of the legislative or judicial departments of the government." 295 U.S. at 628, 55 S.Ct. at 874.[25] As to the latter, it said, "illimitable power of removal is not possessed by the President," and Congress may "fix the period during which [the officer] shall continue in office, and ... forbid ... removal except for cause in the meantime." *Id.* at 629, 55 S.Ct. at 874. This was said to be required by the doctrine of separation of powers, since "sound application of a principle that makes one master in his own house precludes him from impos-ing his control in the house of another who is master there," and since the "coercive influence [of unlimited presidential power of removal] threatens the independence of a commission, which is not only wholly disconnected from the executive department, but which ... was created by Congress as a means of carrying into operation legislative and judicial powers, and as an agency of the legislative and judicial departments." *Id.* at 630, 55 S.Ct. at 875.

The last Supreme Court decision involving the removal power was handed down almost three decades ago. *Wiener v. United States,* 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958), was another back-pay suit, by a commissioner of the War Claims Commission who had been removed by President Eisenhower without cause. It was uncontested that the Commission exercised only "quasi-judicial" functions, and the point at issue was whether Congress had prohibited presidential removal without cause. Despite the absence of any explicit prohibition, the Court found that

> [i]f, as one must take for granted, the War Claims Act precluded the President from influencing the Commission in passing on a particular claim, *a fortiori* must it be inferred that Congress did not wish to have hang over the Commission the Damocles' sword of removal by the President for no reason other than that he preferred to have on that Commission men of his own choosing.

462 U.S. 919, 953 n. 16, 103 S.Ct. 2764, 2785 n. 16, 77 L.Ed.2d 317 (1983).

---

**24.** It is noteworthy, though generally not noted, that the "quasi-legislative" powers referred to in *Humphrey's Executor* were not substantive rulemaking powers, which the Federal Trade Commission itself did not assert it possessed until 1962, *see National Petroleum Refiners Ass'n v. FTC,* 482 F.2d 672, 693 (D.C.Cir.1973), *cert. denied,* 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974), but rather the responsibility to conduct investigations for the purpose of recommending legislation to Congress. *See* 295 U.S. at 621, 628, 55 S.Ct. at 871, 874. Though the holding of *Humphrey's Executor* is necessarily limited to this sort of function, it is generally assumed (though without any Supreme Court holding to sustain the point) that rulemaking is a "quasi-legislative activity" for purposes of the rule of *Humphrey's Executor. See, e.g., INS v. Chadha,*

**25.** The Court did note that the President was authorized to direct the Federal Trade Commission to investigate and report alleged antitrust violations, but described that activity to be an "executive function—as distinguished from executive power in the constitutional sense—[exercised] in the discharge and effectuation of [the Federal Trade Commission's] quasi-legislative or quasi-judicial powers, or as an agency of the legislative or judicial departments of the government." *Humphrey's Executor,* 295 U.S. at 628 & n. *, 55 S.Ct. at 874 & n. 1. In this opinion, we are careful to direct our attention to the question whether the power that the Comptroller General exercises under the Act is "executive power in the constitutional sense."

357 U.S. at 356, 78 S.Ct. at 1279.[26] Accordingly, *Humphrey's Executor* was held to render the removal unlawful.

These cases reflect considerable shifts over the course of time, not only in the Supreme Court's resolutions of particular issues relating to the removal power, but more importantly in the constitutional premises underlying those resolutions. It is not clear, moreover, that these shifts are at an end. Justice Sutherland's decision in *Humphrey's Executor*, handed down the same day as *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), is stamped with some of the political science preconceptions characteristic of its era and not of the present day—if not stamped as well, as President Roosevelt thought, with hostility towards the architect of the New Deal.[27] It is not as obvious today as it seemed in the 1930s that there can be such things as genuinely "independent" regulatory agencies, bodies of impartial experts whose independence from the President does not entail correspondingly greater dependence upon the committees of Congress to which they are then immediately accountable; or, indeed, that the decisions of such agencies so clearly involve scientific judgment rather than political choice that it is even theoretically desirable to insulate them from the democratic process. Moreover, "quasi-legislative" and "quasi-judicial" functions can no longer be regarded as extraordinary or even unusual activities of executive agencies. Finally, the expansion of due process protections, see, e.g., *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25

L.Ed.2d 287 (1970), statutorily prescribed procedures for both rulemaking and adjudication, see 5 U.S.C. §§ 553–559 (1982), and an elaborate system of judicial review, see 5 U.S.C. §§ 701–706 (1982), have provided in more targeted fashion some of the protection against political intervention, when it is inappropriate, which *Humphrey's Executor* sought to provide wholesale. It has in any event always been difficult to reconcile *Humphrey's Executor's* "headless fourth branch" with a constitutional text and tradition establishing three branches of government—assuming, as the rationale though not the narrow holding of *Humphrey's Executor* requires, that the presidential removal for cause permitted under the statute upheld there did not include removal because of the appointee's failure to accept presidential instructions regarding matters of policy or statutory application delegated to him by Congress.

Some knowledgeable observers, see, e.g., Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*, 84 Colum.L.Rev. 573, 633–40 (1984), think that abandonment of the *Humphrey's Executor* analysis has been presaged by the Supreme Court's 1983 decision in *INS v. Chadha*, 462 U.S. at 919, 103 S.Ct. at 2764, which declared invalid the legislative veto of agency action characterized in the majority and one of the dissenting opinions as "quasi-legislative," see *id.* at 953 n. 16, 103 S.Ct. at 2785 n. 16 (majority); *id.* at 989, 103 S.Ct. at 2803–04 (White, J., dissenting), and in the concur-

---

**26.** In other language, the *Wiener* Court suggested its view that, at least with respect to officers exercising "quasi-judicial" powers, the Constitution simply did not vest the President with a power of removal, even one that might be expressly or implicitly limited in appropriate circumstances by Congress. 357 U.S. at 352–53, 356, 78 S.Ct. at 1277–78–1279. This language seems squarely at odds with a long line of authority, beginning with *In re Hennen*, 38 U.S. (13 Pet.) 230, 10 L.Ed. 138 (1839), and unchallenged even by *Humphrey's Executor*, which was careful to limit its decision to the question whether the Constitution vested in the President an "illimitable" power of removal. *Humphrey's Executor*, 295 U.S. at 629, 55 S.Ct. at 874. We are

unwilling to suppose that that line of authority has been overruled by the language in *Wiener*.

**27.** Justice Jackson, who had been Roosevelt's attorney general, remarked:

I really think the decision that made Roosevelt madder at the Court than any other decision was that damn little case of *Humphrey's Executor v. United States*. The President thought they went out of their way to spite him personally and they were giving him a different kind of deal than they were giving Taft.

E. Gerhart, *America's Advocate: Robert H. Jackson* 99 (1958).

rence as "judicial in nature," *see id.* at 966 n. 10, 103 S.Ct. at 2777 n. 10 (Powell, J., concurring). *See also Process Gas Consumers Group v. Consumer Energy Council of America,* 463 U.S. 1216, 103 S.Ct. 3556, 77 L.Ed.2d 1402, 1403, 1413 (1983), *aff'g mem. Consumers Union of United States, Inc. v. FTC,* 691 F.2d 575 (D.C.Cir.1982) (en banc) (per curiam) (applying the holding of *Chadha* to legislative veto of rulemaking by an "independent" regulatory agency). Assuredly some of the language of the majority opinion in *Chadha* does not lie comfortably beside the central revelation of *Humphrey's Executor* that an officer such as a Federal Trade Commissioner "occupies no place in the executive department," and that an agency which exercises only "quasi-legislative or quasi-judicial powers" is "an agency of the legislative or judicial departments of the government," 295 U.S. at 628, 55 S.Ct. at 874.[28]

The Supreme Court's signals are not sufficiently clear, however, to justify our disregarding the rationale of *Humphrey's Executor,* and we view our present task as one of placing the facts before us into the framework established by *Humphrey's Executor* and by the holdings of earlier cases (including *Myers*) which *Humphrey's Executor* did not purport to overrule. In approaching that task, it becomes apparent at the outset that the present case falls neatly between the two stools of *Myers* and *Humphrey's Executor.* The Comptroller General is neither a "purely executive offi-

cer[ ]" whom *Myers* (as reinterpreted by *Humphrey's Executor, see* 295 U.S. at 627–28, 55 S.Ct. at 873–74) requires to be subject to discretionary presidential removal; nor an officer such as that said to be involved in *Humphrey's Executor,* who "occupies no place in the executive department and who exercises no part of the executive power vested by the Constitution in the President," *id.* at 628, 55 S.Ct. at 874. Rather, his status, insofar as the removal powers of the President are concerned, falls precisely within the no-man's land described in the last substantive paragraph of the *Humphrey's Executor* opinion:

> To the extent that, between the decision in the *Myers* case, which sustains the unrestrictable power of the President to remove purely executive officers, and our present decision that such power does not extend to an office such as that here involved, there shall remain a field of doubt, we leave such cases as may fall within it for future consideration and determination as they may arise.

*Id.* at 632, 55 S.Ct. at 875.

It is unquestionable that some of the Comptroller General's powers—indeed, we will posit for purposes of the present decision, *all* except those at issue here—consist of (in the words of *Humphrey's Executor*) "specified duties as a legislative ... aid," in the performance of which he "cannot in any proper sense be characterized as an arm or an eye of the executive." *Id.* at 628, 55 S.Ct. at 874.[29] The Comptroller

---

**28.** *See, e.g.,* the following:

> To be sure, some administrative agency action —rulemaking, for example—may resemble "lawmaking." ... This Court has referred to agency activity as being "quasi-legislative" in character. *Humphrey's Executor v. United States,* 295 U.S. 602, 628 [55 S.Ct. 869, 874, 79 L.Ed. 1611] (1935). Clearly, however, "[i]n the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 587 [72 S.Ct. 863, 866, 96 L.Ed. 1153] (1952). See *Buckley v. Valeo,* 424 U.S., at 123 [96 S.Ct. at 684]. When the Attorney General performs his duties pursuant to § 244, he does not exercise "legislative"

power.... It is clear ... that the Attorney General acts in his presumptively Art. II capacity when he administers the Immigration and Nationality Act. Executive action under legislatively delegated authority that might resemble "legislative" action in some respects is not subject to the approval of both Houses of Congress and the President for the reason that the Constitution does not so require.... Congress' authority to delegate portions of its power to administrative agencies provides no support for the argument that Congress can constitutionally control administration of the laws by way of a congressional veto.

462 U.S. at 953–54 n. 16, 103 S.Ct. at 2785 n. 16.

**29.** *See, e.g.,* 2 U.S.C. § 686 (1982) (Comptroller General shall report unlawful impoundment of

General's powers under the automatic deficit reduction process, however, do not come within that category. Under subsection 251(b)(1), the Comptroller General must specify levels of anticipated revenue and expenditure that determine the gross amount which must be sequestered; and he must specify which particular budget items are required to be reduced by the various provisions of the Act (which are not in all respects clear), and in what particular amounts. The first of these specifications requires the exercise of substantial judgment concerning present and future facts that affect the application of the law—the sort of power normally conferred upon the executive officer charged with implementing a statute. The second specification requires an interpretation of the law enacted by Congress, similarly a power normally committed initially to the Executive under the Constitution's prescription that he "take Care that the Laws be faithfully executed." Art. II, § 3. *And both of these specifications by the Comptroller General are, by the present law, made binding upon the President in the latter's application of the law.* Act § 252(a)(3). Indeed, the Comptroller General is explicitly directed to report to Congress on the extent to which the President follows his instructions. Act § 253. In our view, these cannot be regarded as anything but executive powers in the constitutional sense.

We are, therefore, in the no-man's land described by *Humphrey's Executor,* confronting an officer whose powers are neither exclusively executive nor exclusively nonexecutive. The Comptroller General argues, in essence, that this territory should be awarded to the "exclusively nonexecutive" side—that so long as the officer in question exercises some, or at least a substantial number of, nonexecutive powers, the constitutional restrictions upon the manner of his removal are the same as those applicable in *Humphrey's Executor.* We cannot accept that view.

What has been at issue in the congressional-executive dispute over the power of removal that began in the First Congress is not control over the officer but, ultimately, control over the governmental functions that he performs. And the object of all the Supreme Court's opinions on the subject has been to assure, in the words of Justice Story quoted in *Humphrey's Executor,* "that neither of the departments in reference to each other '[shall] possess, directly or indirectly, an overruling influence in the

funds to both Houses of Congress); 2 U.S.C. § 687 (1982) (Comptroller General may sue the United States to force obligation of unlawfully impounded funds); 31 U.S.C. § 712(2) (1982) (Comptroller General shall estimate cost of compliance with expenditure restrictions in appropriations bills, report to Congress and make recommendations); 31 U.S.C. § 712(3) (1982) (Comptroller General shall analyze the efficiency of executive-agency expenditures of interest to Congress); 31 U.S.C. § 712(4) (1982) (Comptroller General shall make investigations at the request of either House or an appropriate committee thereof); 31 U.S.C. § 712(5) (1982) (Comptroller General shall give assistance and information to appropriate congressional committees); 31 U.S.C. § 716 (1982) (Comptroller General may sue heads of agencies to obtain audit information); 31 U.S.C. § 717(b) (1982) (Comptroller General shall evaluate the results of government activities at the request of either House of Congress or appropriate committees thereof); 31 U.S.C. § 717(c)–(d) (1982) (Comptroller General shall assist Congress and congressional committees in developing methods for the assessment of the results of governmental activities); 31 U.S.C. § 719 (1982) (Comptroller General shall make various reports to Congress and congressional committees).

The special relationship between the Comptroller General and Congress that is expressed in these statutes makes natural the frequent description of the Comptroller General and the General Accounting Office as "part of" or "an agency of" the legislative branch. *See, e.g., Bowsher v. Merck & Co.,* 460 U.S. 824, 844, 103 S.Ct. 1587, 1598, 75 L.Ed.2d 580 (1983); *McDonnell Douglas Corp. v. United States,* 754 F.2d 365, 368 (Fed.Cir.1985); *United States v. McDonnell Douglas Corp.,* 751 F.2d 220, 224 (8th Cir.1984); *Delta Data Sys. Corp. v. Webster,* 744 F.2d 197, 201 n. 1 (D.C.Cir.1984); *but cf., e.g., Lear Siegler, Inc. v. Lehman,* No. CV 85–1125–KN (C.D.Cal. Nov. 21, 1985); *Ameron, Inc. v. United States Army Corps of Eng'rs,* 607 F.Supp. 962 (D.N.J. 1985), *appeal filed,* No. 85–5226 (3d Cir.); *United States ex rel. Brookfield Constr. Co. v. Stewart,* 234 F.Supp. 94, 99–100 (D.D.C.), *aff'd,* 339 F.2d 753 (D.C.Cir.1964) (per curiam). We need not and do not decide, however, whether such characterizations are accurate.

administration of their respective powers.' " 295 U.S. at 630, 55 S.Ct. at 875 (quoting J. Story, *Commentaries on the Constitution of the United States* § 530 (4th ed. 1873)). The pursuit of that principle becomes a foolish game if all that is necessary for Congress to acquire an "overruling influence" over the administration of a constitutional executive power, no matter how significant it may be, is to confer that power upon an official who exercises one or more nonexecutive powers as well. Nor are we disposed to resolve this matter on the basis of whether there is an "adequate" admixture of nonexecutive powers, or whether nonexecutive powers "predominate"; those are neither judicially manageable nor congressionally knowable standards. Thus, under the Comptroller General's theory the heads of most major executive agencies, since they exercise some quasi-legislative or quasi-judicial powers, would currently qualify for *Humphrey's Executor* treatment—and it is impossible to imagine any executive officer who could not be made to qualify by sagacious congressional conferral of nonexecutive powers in the future. On the Comptroller General's theory, not only he but also the Director of the OMB could be subjected to congressional removal.

■ Having concluded that we are in the middle ground, and that the middle ground cannot uniformly be accorded *Humphrey's Executor* treatment, we must decide precisely what treatment the present facts demand. At this point another distinction between *Humphrey's Executor* and the present case becomes relevant: the former upheld a statute that imposed no more than a *partial* restriction upon the presidential power of removal—removal without cause was prohibited, but presidential removal for "inefficiency, neglect of duty, or malfeasance in office" was allowed. The statute governing removal of the Comptroller General, by contrast, eliminates *all* presidential power of removal, and—much beyond that—confers the power of removal upon Congress. The enormous difference between the two, insofar as impact upon the balance of powers is

concerned, is apparent. As was observed by the Court in *Myers*, which, unlike *Humphrey's Executor*, did involve the assertion of removal power by the Congress:

> The Court ... has recognized in the *Perkins* case that Congress, in committing the appointment of such inferior officers to the heads of departments, may prescribe incidental regulations controlling and restricting the latter in the exercise of the power of removal. But the Court never has held, nor reasonably could hold ..., that the excepting clause enables Congress to draw to itself, or to either branch of it, the power to remove or the right to participate in the exercise of that power.

272 U.S. at 161, 47 S.Ct. at 40. It remains true that the Supreme Court has never sanctioned congressional assertion of such a power. We think it at least questionable whether the power would be approved even with respect to officers of the United States who exercise only "quasi-legislative" powers in the *Humphrey's Executor* sense—since it would dramatically reduce the value of the right to appoint such officers which the Constitution has assured to the Executive or to the Courts of Law, a right that the Supreme Court has regarded as an important element of the balance of powers, prompted by the founders' often expressed fear "that the Legislative Branch of the National Government will aggrandize itself at the expense of the other two branches." *Buckley v. Valeo*, 424 U.S. at 129, 96 S.Ct. at 687. We are confident, however, that congressional removal power cannot be approved with regard to an officer who actually participates in the execution of the laws. Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey. Giving such power over executive functions to Congress violates the fundamental principle expressed by Montesquieu upon which the theory of separated powers rests: "When the legislative and executive powers are united in the same person, or in the

same body of magistrates, there can be no liberty; because apprehension may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner." Montesquieu, *The Spirit of Laws*, vol. I, bk. XI, ch. 6, at 152 (London 1823). *See also The Federalist No. 48*, at 327 (J. Madison) (P. Ford ed. 1898) ("[N]one of [the branches] ought to possess, directly or indirectly, an overruling influence over the others, in the administration of their respective powers.").

The Comptroller General argues, however, that a congressional removal power limited to *cause* (which is what we have here) no more enables Congress to control executive powers than did the presidential removal power for cause, which was retained by the statute at issue in *Humphrey's Executor*, enable the President to control the exclusively "quasi-legislative" and "quasi-judicial" powers of the Federal Trade Commission. It is not clear, to begin with, that a "quasi-legislative" power is the same as a legislative power in the constitutional sense, so that the intrusion upon the Executive here is parallel to the intrusion upon the Congress there.[30] Assuming, however, that it is, there are several answers to the Comptroller General's objection. *Humphrey's Executor* neither faced nor considered the question whether the limitations imposed by the doctrine of separation of powers on the scope of executive authority over the removal of nonexecutive officers are precisely equal to the analogous limitations on the scope of congressional authority over the removal of executive officers. Parity is no more to be expected there than it is with respect to the scope of the power to appoint, as to which the Constitution grants only a subordinate role to the Congress. It is the starting point of all judicial analysis in this area, *see, e.g., In re Hennen*, 38 U.S. (13 Pet.) 230, 10 L.Ed. 138 (1839), that the President's power to remove, however much it may be restricted, derives from the constitutional grant of his power to appoint; and we think the permissible impact of that power to remove upon an officer's independence, in comparison to the permissible impact of any such congressional power, may properly reflect the greater strength of that pedigree.[31] Moreover, insofar as effect upon balance of powers is concerned, congressional power to remove is much more potent, since the Executive has no means of retaliation that may dissuade Congress from exercising it—other than leaving the office vacant, thereby impairing the Executive's own functions. Congress, on the other hand, has many ways to make the President think long and hard before he makes a "for cause" removal that Congress disapproves, ranging from budget constriction to refusal to confirm a successor.

It seems to us entirely clear under the recent landmark decision in *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), that if the present statute had not inserted the Comptroller Gen-

---

**30.** Justice Jackson aptly characterized the ambiguity of the "quasi-legislative" and "quasi-judicial" categories enshrined in constitutional jurisprudence by *Humphrey's Executor* as follows: Administrative agencies have been called quasi-legislative, quasi-executive or quasi-judicial, as the occasion required, in order to validate their functions within the separation-of-powers scheme of the Constitution. The mere retreat to the qualifying "quasi" is implicit with confession that all recognized classifications have broken down, and "quasi" is a smooth cover which we draw over our confusion as we might use a counterpane to conceal a disordered bed.
*FTC v. Ruberoid Co.*, 343 U.S. 470, 487–88, 72 S.Ct. 800, 810, 96 L.Ed. 1081 (1952) (Jackson, J., dissenting).

**31.** Of course, the Constitution vests Congress with the power to bring and try impeachments of all officers of the United States. We think it apparent, however, that this very limited power of removal, which may be exercised only through the trial and conviction of an officer for "Treason, Bribery, or other high Crimes and Misdemeanors," Art. II, § 4, simply cannot be compared to the congressional removal power at issue in this case in its effect upon the independence of executive officers. Moreover, the existence of such a carefully limited congressional removal power undermines rather than supports the proposition that Congress may attempt to assert an additional power of removal.

eral between the President and the report of the Directors of the CBO and the OMB, and if the determinations to be made under the Act by the Comptroller General had been assigned instead to the President himself, Congress could not constitutionally provide for legislative veto of those determinations. It is also unthinkable that Congress could constitutionally provide for veto of those determinations by an officer removable by Congress—the Comptroller General, for example. It seems to us no more constitutionally permissible to achieve the same result *ex ante* instead of *ex post*, prescribing in advance the exercise of executive power, instead of invalidating its exercise.

We hold, therefore, that since the powers conferred upon the Comptroller General as part of the automatic deficit reduction process are executive powers, which cannot constitutionally be exercised by an officer removable by Congress, those powers cannot be exercised and therefore the automatic deficit reduction process to which they are central cannot be implemented. As earlier noted, we need not deliberate concerning the effect of this invalidation upon other portions of the Act, since the Act itself provides the answer: replacement of the automatic deficit reduction process with the fallback deficit reduction process, and preservation of the remainder of the Act intact. The Act also requires, § 274(e), that we stay the order implementing our judgment pending the outcome of any appeal.

\*     \*     \*     \*     \*     \*

We do not minimize the effect of our invalidation of one small section of the Act upon the entire statutory scheme. Our holding today eliminates the automatic deficit reduction process, and gives effect to the prescriptions of the Directors of the OMB and CBO only to the extent that they are adopted by joint resolution, *i.e.*, legislation, under the fallback deficit reduction process. It may seem odd that this curtailment of such an important and hard-fought legislative program should hinge upon the relative technicality of authority over the Comptroller General's removal—particularly when we have rejected the more intuitive "excessive delegation" arguments that were the focus of the attacks upon the legislation by its opponents on the floor of Congress and by the plaintiffs here. But the balance of separated powers established by the Constitution consists precisely of a series of technical provisions that are more important to liberty than superficially appears, and whose observance cannot be approved or rejected by the courts as the times seem to require. Both of these points have been eloquently expressed by a respected scholar in course of discussing application of the Constitution's guarantee against removal of judges to officials appointed under Article I but in fact exercising Article III judicial powers:

> Mid-twentieth century Americans have become accustomed to assuming that the central constitutional method of protecting individual freedoms from being overridden by government ukase is to prevent governmental intrusions into certain defined zones of individual conduct. Thus, we quite rightly applaud actions enshrining constitutional rights to freedom of speech, religion, privacy, and equal protection.
>
> Those who wrote the Constitution, however, did not employ this technique. Rather, they emphasized the virtues of limiting governmental power and then dividing the remaining power among autonomous government compartments. Hence, most of our constitutional rights of individual liberty or autonomy are stated in constitutional amendments. The body of the Constitution as originally written is principally an exercise in applying the concepts of federalism and separation of powers to the new American nation. The framers were not disciples of John Stuart Mill, who had not yet been born, but of Montesquieu, whom they had read carefully.
>
> . . . .
>
> . . . [P]art of the value of a clearly expressed, constitutional separation-of-powers principle often inheres in its apparent rigidity or inability to adapt easily

to different solutions. As a nation, one question we must face every day is how far judges and legislators should be separated. Many rational answers to that question are possible. The United States has chosen, by the device of a written constitution, and on the basis of specific historical experience, to resolve that question at one time and in one way for almost all cases. To respect that judgment promotes stability, predictability and consistency, and avoids constant reexamination of troublesome policy issues underlying the question.

Krattenmaker, *Article III and Judicial Independence: Why the New Bankruptcy Courts are Unconstitutional,* 70 Geo.L.J. 297, 301–02, 311 (1981).

We observe, moreover, that although we have rejected the argument based upon the doctrine of unconstitutional delegation, the more technical separation-of-powers requirements we have relied upon may serve to further the policy of that doctrine more effectively than the doctrine itself. Unconstitutional delegation has been invoked by the federal courts to invalidate legislation only twice in almost 200 years, and the possibility of such invalidation, at least in modern times, is not a credible deterrent against the human propensity to leave difficult questions to somebody else. The instances are probably innumerable, however, in which Congress has chosen to decide a difficult issue itself because of its reluctance to leave the decision—as our holding today reaffirms it must—to an officer within the control of the executive branch.

### ORDER

Upon consideration of the pending dispositive motions filed by the parties in the above actions, the memoranda of points and authorities in support thereof and in opposition thereto, and the entire record herein, and all parties having been heard in open court thereon, and for the reasons stated in the accompanying opinion, it is by the court this 7th day of February, 1986,

ORDERED that the automatic deficit reduction process established by the Balanced Budget and Emergency Deficit Control Act of 1985, under which the President is required to issue a sequestration order implementing the budget reduction specifications of a report prepared by the Comptroller General, be, and hereby is, declared unconstitutional on the ground that it vests executive power in the Comptroller General, an officer removable by Congress; and it is further

ORDERED that the presidential sequestration order issued on February 1, 1986 pursuant to the unconstitutional automatic deficit reduction process be, and hereby is, declared without legal force and effect; and it is further

ORDERED that such action is without prejudice to implementation of the alternate deficit reduction process specifically set forth in section 274(f) of the Act to cover the eventuality of the invalidation declared above;

ORDERED, pursuant to subsection 274(e) of the Act, that the effect of this judgment be, and hereby is, stayed during the pendency of any appeal taken under subsection 274(b) of the Act.